UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**ROBERT CORBIN III,**<br><br>Defendant. | Case No. 25-cr-105 |

**SENTENCING MEMORANDUM**

In March of this year, the defendant, Robert Corbin III ("Corbin") was caught with a loaded firearm in his waistband while smoking marijuana and drinking tequila in the common area of a housing complex. Corbin was prohibited from possessing any firearms due to over twenty-five years of felony conduct, including two prior convictions for illegally possessing a firearm. But Corbin did not just again possess an illegal firearm. He possessed a dangerously and recklessly modified one—equipped with a laser sight, large-capacity magazine, and a "conversion switch" that transformed it into an automatic weapon, capable of expelling the round in the chamber and the 19 rounds of ammunition in the firearm's magazine with a single press of the trigger. He is now before this Court to be sentenced for his unlawful possession of a firearm and ammunition as a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). The government respectfully recommends that this Court impose a Guidelines sentence of **84 months**, followed by 36 months' supervised release. In support of its recommendation, the government submits this Memorandum.

**FACTUAL BACKGROUND**

On March 21, 2025, at approximately 8:25 PM, Officers of the Metropolitan Police Department (MPD) Third District were conducting patrols, wearing full MPD uniform in fully marked cruisers. At approximately 8:25 PM, officers responded to the common area of a housing complex located near 107 Q Street Northwest for reports of individuals gambling with firearms present. An individual, who wished to remain anonymous, stated that they saw the barrel of a firearm on the ground and contacted the police.



*Figure 1: Map of Area (red marker denoting 107 Q Street NW)*

Once the officers arrived at the scene, they observed individuals smoking marijuana and drinking in public. Officers approached them and noted that Corbin separated himself from the group as the police arrived and was walking away. Officer Chase Williams ("Officer Williams"), approached Corbin and observed that he was holding what appeared to be and smelled like a

marijuana cigarette and an open red cup that smelled of tequila. Marijuana is a Schedule I controlled substance under federal law and it is a violation of District of Columbia Code to consume it in public spaces, *see* D.C. Code 48-911.01. The officer also observed that Corbin was carrying a blue duffel bag.

Officer Williams asked Corbin if he had any additional marijuana in the bag or guns on him, which Corbin denied. As Officer Williams patted Corbin down, he felt a hard object in his waistband, which in the officer's training and experience, was consistent with a concealed firearm. Officer Williams asked Corbin what the object was. Corbin responded "nothing" and attempted to shove Officer Williams' hands away from his waistband and grabbed toward the officer.

Additional officers ran over to where Corbin and Officer Williams were standing to assist. Officer Williams alerted the other officers that there was a firearm in Corbin's waistband, and an officer recovered the firearm.



*Figure 2: Officer Recovers Firearm from Corbin's Waistband*

As the officers attempted to arrest Corbin, he grabbed at officers and moved his arms in what appeared to be an attempt to prevent them from placing handcuffs on him. After several minutes, he was eventually handcuffed without further incident.

The firearm recovered was later determined to be a Glock 19 9-millimeter bearing serial number BNYV328. The firearm was loaded with one bullet in the chamber and an additional nineteen rounds in a large-capacity magazine. It was further equipped with a laser sight and modified with a converter switch, which is also commonly referred to as a "giggle switch." A "giggle switch" is designed to convert a traditional handgun into a fully automatic handgun or machine gun, giving the shooter the ability to expel the entire magazine with just one press of the trigger.



*Figure 3: Loaded Firearm Recovered from Corbin's Waistband with "Giggle Switch," Laser Sight, & Large-Capacity Magazine*



*Figure 4: Loaded Magazine in Firearm Recovered from Corbin's Waistband*

In addition, search incident to the arrest of a blue duffel bag on Corbin's person revealed an additional large capacity magazine inside of the bag. The magazine had a thirty-one (31) round capacity and was loaded with seventeen (17) rounds of 9 millimeter ammunition.



*Figure 5: Additional Large-Capacity, Loaded Magazine Recovered from Corbin's Bag*

Corbin's identity was confirmed, and it was confirmed that he did not have a license to carry a handgun in the District of Columbia.

5

**PROCEDURAL HISTORY**

Corbin was initially charged in DC Superior Court, Case No. 2025-CF2-003067, with Unlawful Possession of a Firearm (Prior Conviction), D.C. Code, § 4503 (a)(1),(b)(1), Possession of a Machine Gun, D.C. Code § 4514(a)(c)(2), and Carrying a Pistol without a License (Outside Home or Place of Business), D.C. Code, § 4504(a)(2). On March 27, Magistrate Judge Matthew Sharbaugh signed a federal criminal complaint against Corbin for violation of 18 U.S.C. § 922(g)(1) (unlawful possession of a firearm or ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year). The Court subsequently ordered the defendant held without bond following a detention hearing on April 4. On April 10, a federal grand jury returned a one-count indictment, charging Corbin with violation of 18 U.S.C. § 922(g)(1) (Count One). ECF No. 8.

On July 1, 2025 Corbin pled guilty pursuant to a negotiated agreement. ECF No. 17. Under the agreement, Corbin pled guilty to Count One in exchange for the government agreeing not to seek further charges for Corbin's conduct as described in the Statement of Offense, ECF No. 18.

**LEGAL STANDARD**

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be calculated."). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of

6

sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>     (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>         (i) issued by the Sentencing Commission ...; and
>         (ii) that, . . . are in effect on the date the defendant is sentenced; ...
>
> (5) any pertinent policy statement –
>     (A) issued by the Sentencing Commission ... and
>     (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

## **SENTENCING GUIDELINES CALCULATIONS**

To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *United States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry

must include an evaluation of all relevant conduct that could affect the Guidelines calculation. As noted:

> In the post-*Booker* world, the court must calculate and consider the applicable Guidelines range but is not bound by it. Under the Guidelines, "the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." *Witte v. United States*, 515 U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3 details the conduct the sentencing court may consider in determining the applicable Guidelines range and the commentary to that section states, "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."

U.S.S.G. § 1B1.3, Commentary, Background.

Here, all agree that the offense level is 26, *see* ECF No. 17 (Plea Agreement) and Presentence Investigation Report ("PSIR), ECF No. 22 at ¶ 22, with a final score of 23 after the 3-point reduction for Acceptance of Responsibility is applied. There is an unresolved dispute between the government and the PSIR as to the calculation of Corbin's criminal history score and whether Corbin's final Criminal History is Category IV or V. *See* ECF Nos. 20 & 21 (United States' Notice of Objections to the Draft PSIR) and ECF No. 22 (Final PSIR). The government maintains its position that under USSG §§ 4A1.2(3) and 4A1.2(k)(2), the Court should assign three points to Corbin's conviction in Case No. 1998-FEL-5252 because he was last incarcerated for that offense within fifteen years of the commission of this offense, bringing Corbin's final Criminal History Score to 12, or Category V.

Depending on the Court's ruling on that contested issue, the applicable Guidelines range is either 70-87 months imprisonment (Criminal History IV) or 84-105 months (Criminal History V). The government's requested sentence, 84 months, is within both Guidelines ranges and thus presumed reasonable regardless of how the Court rules on the Criminal History calculation.

**THE GOVERNMENT'S SENTENCING RECOMMENDATION**

As stated above, the government respectfully recommends that this Court sentence the defendant to a term of 84 months' imprisonment to be followed by 36 months' supervised release. This sentence reflects the serious nature of this offense, Corbin's three-decades of criminal history including multiple prior convictions for unlawful possession of firearms and drug distribution, and provides adequate deterrence to others in the community, particularly given the extreme danger associated with machine gun conversion devices and the devastating impact these deadly modifications to illegal firearms have on those living and working in DC.

*<u>The Nature and Circumstances of the Offense</u>*

While Corbin is charged with a possessory offense, the scourge of illegal firearms across DC fundamentally threatens this community's safety and this Court has repeatedly warned against discounting the inherent danger associated with loaded firearms. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *7-8 (D.D.C. Feb. 6, 2023), *aff'd,* No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). This crime presents a particular danger to the community because the handgun in Corbin's waistband had been modified with a conversion switch, which is designed to convert a traditional handgun into a fully automatic handgun or machine gun. Through these modifications, the firearm had been effectively transformed from an already-dangerous loaded handgun into a weapon of war, ready to spray 20 rounds of ammunition towards the target of Corbin's choosing with a single pull of the trigger. When arrested, Corbin was fully armed and ready for battle on the streets of DC, having a second large-capacity magazine within arms reach, in a duffel bag on his person.

There has been an exponential boom in machine gun conversion switches nationwide. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, 4-5 (2023) "National Firearms Commerce

and Trafficking Assessment (NFCTA): Crime Guns - Volume Two," https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-vii-recommendations/download (noting 570% increase in recovered machine gun conversion parts in 2017 to 2021 compared to 2012 to 2016). Our community has not escaped this alarming trend and the dramatic increase in machinegun conversion devices recovered in the past few years alone is frightening. Below are the estimated number of recovered machinegun conversion devices recovered in DC over the last few years, according to ATF:

- 2021: 27 Machinegun Conversion Switches Recovered
- 2022: 119 Machinegun Conversion Switches Recovered
- 2023: 195 Machinegun Conversion Switches Recovered
- 2024: 200 Machinegun Conversion Switches Recovered

In other words, there was an over 340% increase in recoveries of machinegun conversion devices in DC from 2021 to 2022. This trend accelerated in 2023 and 2024, with an over 640% increase in recoveries of machinegun conversion devices in DC from 2021 through 2024.

The danger posed by firearms such as the one recovered here cannot be overstated. It is also particularly concerning that Corbin kept such a weapon loaded and within arm's reach—along with a second, even *larger* capacity partially-loaded magazine in his bag—as he gathered with others and consumed marijuana and alcohol in the common area of a housing complex. He further created an even greater risk to himself, the community, and the officers involved in his arrest by attempting to prevent the officer from performing a protective pat down and struggling with the officer after the firearm was identified.

The statute and Guidelines amply support the requested sentence. Congress recently increased maximum sentences for 18 USC § 922(g) from 10 years to 15 years, indicating just how

seriously courts should view these possessory offenses. It is also notable that, due to his criminal history, Corbin's conduct nearly qualified for a 15-year mandatory minimum under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). Similarly, if Corbin had been charged under 18 U.S.C. § 922(o) (Possession of a Machine Gun), he would have qualified as a Career Offender under the Guidelines with an automatic Criminal History Category 6, and a Guidelines range of 92 to 115 months.[1] In short, this was a dangerous offense by a repeat offender that justifies the government's requested sentence of 84 months.

### *The History and Characteristics of the Defendant*

This is not Corbin's first offense, or even his first or second offense for possession of an illegal firearm. Over the past three decades, he has repeatedly engaged in dangerous and sometimes violent criminal conduct that harms the community, often while still under supervision for a prior offense. Corbin's conduct is detailed at length in the PSIR, ECF No. 22, and summarized below.

Corbin's adult criminal history begins at the age of 18, when he was arrested and charged in DC Superior Court Case No. 1998-FEL-005252 with First Degree Murder and Carrying a Pistol Without a License (Prior Felony) ("CPWL"). He pled guilty in 1999 to the CPWL and was sentenced to 20 months to 5 years of confinement, with the sentence suspended as to all but 18 months and an original term of supervision of 5 years. *See* PSIR at ¶ 35. Corbin was released in November 1999. Around eight months later and while on probation for that offense, he was arrested for Distribution of Cocaine, pled guilty in DC Superior Court Case No. 2000-FEL-004125, and was sentenced in June 2001 to 2 years to 6 years confinement. He was released in

---

[1] Under USSG § 4B1.1, a defendant is a career offender if the offender was at least 18 years old, the offense of conviction is a felony that is either a controlled substance offense or a crime of violence, and the defendant has at least two prior felony convictions for crimes of violence or controlled substance offenses. Corbin has two qualifying controlled substance offenses, DC Superior Court Case Nos. 2000-FEL-4125 and 2007-CF2-21552. Here, had Corbin been charged with 18 U.S.C. § 922(o), that would have met the definition of a "crime of violence" for purposes of USSG § 4B1.1. *See* USSG § 4B1.2(a)(2) (defining "crime of violence" to include "the use or unlawful possession of a firearm described in 26 U.S.C. 5845(a)").

11

March 2004 and, almost immediately, repeatedly violated the conditions of his release in both 1998-FEL-005252 and 2000-FEL-004126. *Id.* at ¶¶ 35-36. As a result, a parole violation warrant was issued in December 2004 and executed in September 2005.

Following the parole revocations and subsequent incarceration in 1998-FEL-005252 and 2000-FEL-004126, Corbin was released once again in September 2006 and, as before, almost immediately violated the conditions of his release. *Id.* at ¶¶ 35-36. He was arrested on January 27, 2007 for drug distribution, and again in September 2007 on the same charge after Corbin was observed selling crack cocaine. *Id.* at ¶ 35 (discussing January 2007 arrest), ¶ 37 (September 11, 2007 arrest). The latter was charged in DC Superior Court Case No. 2007-CF2-21552, and in December 2007 Corbin pled guilty to Distribution of Cocaine. He was sentenced in February 2008 (by then-Superior Court Judge Boasberg) to 20 months incarceration and 5 years supervised release. *Id.* at ¶ 37. He completed that sentence in May 2009 but was not released until January 2010 due to the parole revocations in 1998-FEL-005252 and 2000-FEL-004126. *Id.*

Following his release in January 2010, Corbin continued to struggle to comply with court supervision, which was now ongoing in *three* separate felony cases (1998-FEL-005252, 2000-FEL-004126, and 2007-CF2-21552). He repeatedly failed to comply with drug testing and failed to report for supervision. *Id.* at ¶ 37. The United States Parole Commission (USPC) issued a violator warrant in January 2011, and Corbin's parole was again revoked in 1998-FEL-005252 and 2000-FEL-004126. He was released on January 12, 2012, with a full-term expiration of parole in 1998-FEL-005252 of August 29, 2014. Unfortunately, a familiar sequence of events again played out. Corbin failed to comply with drug testing or report for supervision, and on one occasion was observed attempting to falsify a drug test. *Id.* at ¶ 35. He was also again arrested in the months following his release: on October 4, 2012 (Assault on a Police Officer, Disorderly Fighting, and

12

Threats to Injure a Person) and October 11, 2012 (Second Degree Theft).

Although there is a clear paper trail as to Corbin's noncompliance with supervision across all prior convictions, the records are unclear as to whether Corbin was incarcerated after January 2012 for the 1998 offense. While CSOSA records indicate that Corbin's parole was again revoked in November 2012 for 1998-FEL-005252, with a release date of July 1, 2013, the PSIR was unable to corroborate the revocation through Bureau of Prisons (BOP) and USPC records. In any case, Corbin's supervision in 2000-FEL-4125 was revoked on April 5, 2013, and he was released on July 1, 2013. A little over a month later—during which he racked up multiple supervision violations—Corbin was arrested on August 14, 2013 for Assault on a Police Officer, Possession of PCP, Indecent Exposure, and Unlawful Entry. In that incident, a complainant called the police after Corbin and a female companion entered their property without permission. When officers arrived at the scene, they found Corbin and his companion engaging in a sex act. Corbin then repeatedly refused officers' orders and when an officer attempted to handcuff him, Corbin pushed the officer and fled the scene and was seen dropping a bottle of PCP as he fled. Officers caught up with him and Corbin continued to resist arrest. There was a struggle with multiple officers, which eventually required an officer to deploy pepper spray to gain control. In 2014, a DC Superior Court jury in Case No. 2013-CF2-014365 found Corbin guilty of indecent exposure, unlawful entry, and three counts of assault on police officers.[2] He was sentenced to 120 days confinement and released from custody on April 1, 2015.

Following his release and after additional supervision violations in Case No. 2007-CF2-21552, *id.* at ¶ 37, Corbin was arrested on October 12, 2015, and the Gerstein from that arrest

---

2 While awaiting trial in Case No. 2013-CF2-014365, the defendant's supervision was revoked in Case No. 2007-CF2-21552, and he was later sentenced to 18 additional months of incarceration in Case No. 2007-CF2-21552. PSIR at ¶ 37.

reflects that officers responding to a burglary complaint determined that Corbin had either tampered with or failed to charge his GPS tracking device and that he was in violation of a court-ordered curfew. In addition to that incident, he was recorded as noncompliant with multiple other conditions of supervision, perhaps best summarized by Corbin's reported comments during a home visit to "fuck CSOSA and this officer." *Id.* at ¶ 37. His supervision was subsequently revoked in March 2016 and Corbin released from custody once again on September 23, 2016.

Just over six months later, Corbin was arrested following an armed robbery in Northwest DC. He later pled guilty to that conduct in DC Superior Court Case No. 2017-CF3-006093 to Unlawful Possession of a Firearm (Prior Conviction). *Id.* at ¶ 39. According to the agreed proffer of facts, on April 8, 2017, two individuals were robbed of their phones and wallets at gunpoint by Corbin and a co-defendant. *Id.* While canvassing the area following the robbery, the officers identified the co-defendant with Corbin and attempted to stop them. Corbin took flight and was eventually apprehended "ducking down" near a vehicle. After he was asked to stop, an officer heard the distinctive sound of a gun hitting the ground, and shortly after recovered a silver Taurus 70 firearm underneath the vehicle and near Corbin. Additionally, during a search incident to arrest, the police recovered from one of Corbin's pockets one of the stolen wallets and a firearm magazine with 7 rounds of ammunition. Following his plea, Corbin was sentenced to 48 months confinement and three years of supervised release. *Id.* He was sanctioned multiple times during his incarceration, most notably for possession of a dangerous weapon. *Id.*

Corbin satisfied his sentence in December 2020. After again incurring numerous supervision violations throughout 2021 through February 2023, in December 2023 he successfully completed supervision in 2017-CF3-006093. *Id.* at ¶ 39. However, his recent conduct made clear that Corbin remains either unwilling or unable to comply with the law. As a convicted felon and

particularly given his relatively recent conviction for Unlawful Possession of a Firearm (Prior Conviction), Corbin understood on March 21, 2025 that he was not allowed to possess a firearm. He nonetheless chose not only to once again illegally *acquire* a firearm, but to carry that loaded, dangerously modified firearm while socializing with others in the common area of a housing complex.

### *The Need for the Sentence Imposed*

The requested sentence is sufficient but not greater than necessary to meet the goals of sentencing. It provides a specific deterrence and will keep our community safe from the defendant for a period of time. Corbin's flagrant and repeated criminal conduct, particularly while on supervision and as discussed at length above, has abundantly demonstrated that the prior sentences and court supervision did not adequately deter him from returning to his life of crime and he remains a danger to the community. A lengthier sentence will also provide the defendant yet another opportunity to reflect on the serious nature of his crimes, commit to reforming his conduct, participate in BOP programming including those recommended in the PSIR, and re-enter as a contributing and lawful member of the community. It also provides general deterrence: it will signal to the community that possession of illegal firearms is serious conduct and discourage them from doing so. Although there is a need for deterrence in every unlawful firearm case, the need for deterrence is particularly acute in cases such as these, where an already-dangerous illegal, loaded firearm has been recklessly modified with a "giggle switch" to function as an automatic weapon. Modified firearms are breathtakingly dangerous and continue to proliferate through our community with deadly consequences. A lengthy sentence is needed to enforce to the community that possession of these modified firearms is serious and discourage others from seeking and carrying these weapons of war through the streets of DC.

**CONCLUSION**

Over the last thirty years, Corbin has repeatedly engaged in unlawful conduct, including the conduct to which he has pled here: unlawful possession of a firearm. Despite knowing that carrying firearms harms our community and can lead to violence, he continues to obtain illegal firearms. His prior convictions and sentences have done nothing to deter him. He is 45 and well acquainted with the criminal justice system; he does not have the excuse of youth or ignorance. The government respectfully requests that the Court impose a sentence of 84 months incarceration followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:   /s/ *Emily Reeder-Ricchetti*
      EMILY REEDER-RICCHETTI
      DC Bar No. 252710
      Special Assistant United States Attorney
      601 D Street, N.W.
      Washington, D.C. 20530
      202-834-0553
      Emily.Reeder-Ricchetti2@usdoj.gov